**TENENBAUM & SAAS, P.C.**

BRADSHAW ROST, VSB #27134
4504 WALSH STREET, SUITE 200
CHEVY CHASE, MD 20015
(301) 961-5300

ATTORNEYS FOR PLAINTIFF OAKLAWN DEVELOPMENT PARTNERS, LLC.

FILED

2010 MAR -3  P 2: 45

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| OAKLAWN DEVELOPMENT PARTNERS, LLC<br>44031 Pipepline Plaza, Suite 100<br>Ashburn, VA 20147<br><br>  Plaintiff<br>vs.<br><br>EXXONMOBIL OIL CORPORATION<br>3225 Gallows Road<br>Fairfax, Virginia 22037-0001<br><br>And<br><br>STEWART TITLE GUARANTY CO.<br>1980 Post Oak Boulevard #610<br>Houston, Texas 77056<br><br>  Defendants | UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA<br><br>Civil Action 1:10CV200 - TSE/TCB<br><br>**COMPLAINT FOR BREACH OF CONTRACT** |

Plaintiff Oaklawn Development Partners, LLC, , by and through its counsel, hereby files its Complaint for Breach of Contract against Defendants ExxonMobil Oil Corporation and Stewart Title Guaranty Company. For its Complaint, Plaintiff states as follows:

### I.   PARTIES AND JURISDICTION

1.   Plaintiff Oaklawn Development Partners, LLC ("**Oaklawn**"), is a limited liability company formed under the laws of the Commonwealth of Virginia with its principal place of business located in Loudoun County, Virginia.

2. Defendant ExxonMobil Oil Corporation ("**Exxon**") is New York Corporation with its principal place of business located in New York State and transacts business in the Commonwealth of Virginia with an address of 3225 Gallows Road, Fairfax, Virginia.

3. Defendant Stewart Title Guaranty Company ("**Stewart Title**") is a Texas corporation with its principal place of business located in Texas and transacts business in the Commonwealth of Virginia with a business address located in Fairfax, County, Virginia.

4. The amount in controversy exceeds $75,000.00.

5. There is a complete diversity of citizenship between the Plaintiff and Defendants and therefore, jurisdiction and venue is proper before this Court.

## II.   STATEMENT OF THE CASE

6. The allegations contained in paragraphs 1 through 5 of the Complaint are incorporated and adopted by reference herein.

### A.   The Overall Development Plans

7. Oaklawn was the owner of the unimproved real property located near the southeast corner of the intersection of Battlefield Parkway and Miller Drive, Town of Leesburg, Commonwealth of Virginia and referred to herein as "**Land Bay D**".

8. Oaklawn intended to develop Land Bay D by dividing Land Bay D into five (5) separate parcels, referred to as (i) "Lot D-1"; (ii) "Lot D-2"; (iii) "Lot D-3"; (iv) "Lot D-4"; and (v) "Lot D-5".

9. To be constructed on the five separate parcels on Land Bay D was a sit-down restaurant, office building, fast-food restaurant, gas station with a convenience store and car wash, and a fire and rescue facility for the Town of Leesburg (collectively referred to as the "**Development Plan**").

10. Land Bay D is an integrated site, and thus, the development and construction of the improvements on the five individual parcels were interdependent with each other and the success of the Development Plan for all of Land Bay D required final approval of a site plan by the Town of Leesburg.

11. The placement and recordation of easements on the five separate parcels to permit access to and from the five parcels and for utility, water, storm and sanitary lines were integral to the overall design and approval of the site plan for Land Bay D, and in turn, was required in order to successfully complete the development on each parcel in accordance with the Development Plan.

12. Consistent with the Development Plan, Oaklawn proceeded to market the separate parcels to potential end-users.

13. For example, on September 18, 2007, Oaklawn entered into an Agreement of Purchase and Sale with Davco Restuarants, Inc. ("**Davco**") for the sale of Lot D-4 for $1.5 million dollars, upon which the purchaser was going to construct and operate a Wendy's Restaurant (the "**Wendy's Contract**").

### B. The Real Estate Contract Between Oaklawn and Exxon

14. Oaklawn and Exxonentered into a Real Estate Contract with an effective date of July 14, 2006 ("Contract"), as amended by (i) a First Amendment to the Real Estate Contract, dated October 5, 2006 ("First Amendment"); (ii) Second Amendment to the Real Estate Contract, dated October 13, 2006 ("Second Amendment"); and (iii) Third Amendment to Real Estate Contract, dated December 18, 2007 ("Third Amendment"). The Real Estate Contract, First Amendment, Second Amendment, and Third Amendment collectively referred to herein sometimes as the "Contract".

15. Pursuant to the Contract, Exxon agreed to purchase Lot D-3, containing approximately 2.23 +/- acres of land, net of rights-of-way and flood plain (the "**Exxon Lot**") for $3 million dollars ($3,000,000.00).

**C.   Oaklawn's Construction Obligations and the Escrow of $500,000.00.**

16. Subsequent to the closing on the Contract, Oaklawn was to complete certain improvements to the parcels adjacent to the Exxon Lot, defined as the "Seller's Work", which work would assist in making the Exxon Lot "shovel ready" for the construction of the improvements contemplated by Exxon on the Exxon Lot under the Contract. Specifically, Oaklawn's work consisted of the following items:

> **Seller's Development Obligations**.
>
> **Seller's Post-Closing Obligations:** Subsequent to Closing, Seller shall promptly commence and thereafter diligently pursue to completion, subject in all events to Purchaser delays and events beyond the reasonable control of Seller, including but not limited to governmental delays, the following ("Seller's Work"):
>
> (a) construction of, direct access to a base or finish paved private right of way contiguous to the [Exxon Lot] sufficient in size to accommodate tanker truck fuel deliveries to the [Exxon Lot], and a curb cut and apron into the [Exxon Lot] from such a private right of was as shown on **Exhibit "D-1"** along with and agreement regarding the allocation of maintenance cost for any jointly used paved private right of way directly serving the [Exxon Lot];
>
> (b) construction of, sanitary sewer, water and stormwater conveyance lines to the boundary of the [Exxon Lot], in dedicated rights of way, in size and capacity sufficient to service the Project (provided that any connection or tap fee shall be the obligation of Purchaser) and as otherwise shown on **Exhibit "D-1"** attached hereto;
>
> (c) construction of rough grading of the [Exxon Lot] to +/- 1' of final grade, consistent with the site plan and as provided on **Exhibit "D-1"** attached hereto;
>
> (d) adjustment of the boundary lines of the [Exxon Lot] to conform the Exxon Lot to Lot D3A of **Exhibit "A"**.

17. In view of the fact that it was agreed that the Seller's Work was to be performed subsequent to closing it was further agreed that $500,000.00 of the purchase price would be held in escrow pursuant to the terms of an "Escrow Agreement for Seller's Work" which was referenced in the Contract and the form attached thereto as Exhibit "G", which form designated Stewart Title as the escrow agent.

**D.    The Escrow Agreement**

18. On November 15, 2006, Oaklawn, Exxon and Stewart Title executed the Escrow Agreement for Seller's Work (the "Escrow Agreement"), and $500,000.00 of the purchase price that was otherwise payable to Oaklawn was placed in trust with Stewart Title subject to Stewart Title's obligation to faithfully discharge its duties under the terms of the Escrow Agreement.

19. Pursuant to the Escrow Agreement Stewart Title was required to invest the Escrow Funds in 30-day U.S. Treasury Bills (with automatic reinvestment), unless and until instructed otherwise by Seller in writing.

20. Stewart Title was selected as the escrow agent by Exxon due to the established and significant business relationship between Stewart Title and Exxon in that Stewart Title performs a substantial amount of work for Exxon on a nationwide basis. As a result, Stewart Title has a vested interest in maintaining a harmonious and cooperative relationship with Exxon so as to continue to derive the significant financial benefits from its existing and continuing business relationship with Exxon.

21. Pursuant to the terms of the Escrow Agreement, Oaklawn was entitled to the disbursement of the $500,000.00 in escrow as the Seller's Work was performed and completed upon submission of certain documentation and information evidencing completion of the

identified portion of the Seller's Work (defined in the Escrow Agreement as the "Disbursement Request").

22. Pursuant to the Escrow Agreement, any Disbursement Request and accompanying documentation was to be delivered to Stewart Title with a copy simultaneously to Exxon.

23. The Escrow Agreement specifically provided that following receipt of the Disbursement Request: "In the event Escrow Agent does not receive a written notice of dispute from [Exxon] within five (5) days of receipt of the Disbursement Request, [Stewart Title] is authorized and *irrevocably directed* to disburse to [Oaklawn] the amount set forth in the Disbursement Request." [Emphasis Added]

24. The Escrow Agreement further stipulated that Steward Title could only take such action with respect to the "disposition, delivery and application of the funds as may be expressly permitted or required pursuant to this Agreement" and further, Stewart Title was only to "provide the notices and communications as may be expressly permitted or required by this Agreement."

25. The Escrow Agreement commanded Stewart Title to "comply with notices and instructions as are specifically provided for" in the Escrow Agreement and in that regard, it was agreed that Stewart Title would "be fully protected in relying upon any written notice, demand, certificate or document which it in good faith believes to be genuine."

26. The Escrow Agreement further stipulated that: "Time is of the essence with regard to this Agreement and the performance by the parties of their respective obligations hereunder."

### E. Exxon's Development Obligations Under the Contract with Oaklawn

27. Under the Contract, Exxon was required to complete certain development work on the Exxon Lot for purposes of enabling Oaklawn to perform the Seller's Work as specified in the Contract, and to allow Exxon to construct and operate a retail motor fuel facility, a convenience products store, a car wash, and any other ancillary uses to be determined by Exxon (collectively the "**Project**").

28. Specifically, the Contract imposed upon Exxon certain "**Development Obligations**" and pursuant to those Development Obligations Exxon was required to "promptly commence and thereafter diligently pursue to completion" its development obligations of the Exxon Lot which included Exxon's obligation to "cooperate with [Oaklawn] in connection with [Oaklawn's] efforts to perform the Seller's Work, and provide Oaklawn a "proposed fully engineered development plan for the Exxon Lot reflecting building locations . . . . and any and all other features and improvements as are typically reflected on a detailed site plan submission in the Town of Leesburg and/or County of Loudoun, Virginia. (including the requirements of any other applicable governmental entity having jurisdiction thereover) (upon receipt and approval of which the preliminary site plan attached hereto as Exhibit E shall be revised consistent therewith, and shall thereafter constitute Exhibit E for all purposes hereof. [the "**Site Plan**"]"

29. Thus, the Contract contemplated and provided that as the work progressed to implement the Development Plans for Land Bay D, and the individual five parcels, that the preliminary Site Plan attached to the Contract would be amended and modified to address and satisfy any requirements imposed by the Town of Leesburg in order to obtain final approval of the Site Plan for Land Bay D.

30. The Contract stipulated that "promptly following Closing, [Exxon shall] apply for and thereafter diligently pursue obtaining all necessary permits, license and approvals necessary for the construction and operation of the Project, including but not limited to that work as is identified on Exhibits D-2 and D-3 attached hereto, all building approvals and permits, BAR approval, and any all required health permits and approvals."

31. Exxon's Development Obligations, while necessary for the construction of the Project by Exxon, were also important and integral to the efficient implementation of the Development Plan for the remaining parcels consistent with Site Plan.

32. The Town of Leesburg required the installation of a device on the Exxon Lot which device would separate the oil and water generated on the Exxon Lot as a result of the operation of the gasoline station and car wahs. The original Site Plan called for the installation of two such devices, but based upon further discussion with the Town of Lessburg it was agreed that only one device needed to be installed. It was subsequently agreed between Oaklawn and Exxon that a device manufactured by Baysaver Technologies, Inc. was the most efficient and effective device to treat storm water by separating debris and trapping pollutants before they enter the waterways (hereinafter referred to as the "**BaySaver**").

33. In addition, in order to install the Baysaver, the Town of Leesburg required that an easement be granted with respect to that portion of the Exxon Lot upon which the BaySaver device would be installed.

34. Extensive communications occurred between Exxon and Oaklawn regarding the submission of revisions to Site Plan, which included the need for Exxon to install the BaySaver. The revisions to the Site Plan and the need for the BaySaver were reviewed by professionals retained by Exxon experienced in these matters with the expertise to review, comment upon, and

approve on Exxon's behalf any changes to the Site Plan. Based upon this extensive discussion and review, Exxon and Oaklawn executed the Third Amendment, whereby it was confirmed and specifically agreed that Exxon would construct and install a BaySaver on the Exxon Lot, which by definition included granting the necessary easement for the BaySaver as required by the Town of Leesburg.

35.   Moreover, in addition to the BaySaver, the Site Plan required that Exxon grant certain easements on the Exxon Lot to permit access to and between the various parcels on Land Bay D, and for the construction and placement of sewer, water, storm, and utility lines on and through the Exxon Lot which access and sewer, water, storm and utility lines were required for the successful development of the other parcels, including but not limited to, Lot D-4 located immediately adjacent to the Exxon Lot which was under contract to Davco for $1.5 million dollars.

F. **Exxon's Breach of the Contract**

36.   Subsequent to the execution of the Real Estate Contract, Exxon made the decision to get out of the business of constructing gasoline stations with convenience stores on unimproved real estate, and as a result elected to "mothball" any plans to complete the Project on the Exxon Lot contemplated by the Contract. Upon information and belief, Exxon is actively involved in marketing the Exxon Lot for purposes of selling the Exxon Lot to a third party.

37.   In furtherance of that business decision, however, Exxon also made the decision not to complete the Development Obligations specified in the Contract so as not to incur the expense and time associated with those tasks. Moreover, upon information and belief, the business decision was made that Exxon did not want to burden the Exxon Lot with any

improvements or easements required by its Development Obligations so as not to create any obstacle or impediment to the sale of the Exxon Lot to a new purchaser.

38. The decision by Exxon to willfully cease performance of its Development Obligations under the Contract prevented Oaklawn from being able to complete its Development Plan for Land Bay D consistent with the Site Plan, as then currently agreed to by Exxon, and the sale of the adjacent parcels to the Exxon Lot.

39. Oaklawn repeatedly requested that Exxon grant the necessary easements on the Exxon Lot and install the BaySaver.

40. These discussions continued for more than a year without Exxon granting the easements as required by the Contract or agreeing to install the BaySaver as expressly required by the Third Amendment.

41. The failure of Exxon to grant the easements prevented Oaklawn from performing its Seller's Work as specifically defined and set forth in the Contract.

42. Once it became clear that Exxon would not grant the necessary easements, Oaklawn was forced to redesign, at considerable cost and with significant delay, the Development Plans in order to create alternative solutions for access to the parcels and to deliver the necessary water, sewer, storm, and utility lines to the adjacent parcels, including Lot D-4 which was under contract to Davco.

43. By the time Oaklawn was able to complete the redesign of the development work in response to Exxon's breach of the Contract, and the resulting inordinate delay in order to secure final Site Plan approval, the current economic conditions had drastically changed and as a result, Davco elected not to proceed with its contract to purchase Lot D-4 and terminated its contract with Oaklawn, causing damages to Oaklawn in excess of $1 million dollars.

### G. Breach of Escrow Agreement

44. As stated above, it was physically impossible for Oaklawn to complete the Seller's Work as specifically defined in the Contract due to Exxon's breach of its Development Obligations, and decision to abandon development and construction of the Project on the Exxon Lot.

45. Oaklawn developed and re-designed alternative arrangements for the easements which provided the same benefits to Land Bay D as contemplated by the Contract, at an additional unanticipated cost to Oaklawn of approximately $250,000.00.

46. This redesigned plans, necessitated by Exxon's breach, negated the need and ability to complete the Seller's Work as specifically defined in the Contract.

47. By written notice dated February 3, 2010, Oaklawn delivered via overnight courier through United Parcel Service ("UPS"), in accordance with the terms of the Escrow Agreement, a Disbursement Request to Stewart Title, with a copy of the Disbursement Request delivered to Exxon at the same time in the same manner, requesting payment of the $500,000.00 in escrow plus the accrued interest, being held by Stewart Title.

48. The Escrow Agreement provided that notice of the Disbursement Request "shall be deemed duly given when received" if sent by a nationally recognized overnight carrier. The Disbursement Request was received by Stewart Title and Exxon at the notice addresses specified in the Escrow Agreement on February 3, 2010, as evidenced by the proof of delivery provided by UPS.

49. In accordance with the aforementioned provisions of the Escrow Agreement, in the event Stewart Title "*did not receive written notice of a dispute*" from Exxon by February 8, 2010, Stewart Title was "irrevocably directed to disburse to" Oaklawn the $500,000.00.

11

50. As of February 9, 2010, Exxon had not issued or delivered any written notice of dispute objecting to the release of the escrowed funds pursuant to the Disbursement Request.

51. As of February 11, 2010, Stewart Title, in willful disregard and breach of its explicit obligations under the Escrow Agreement, had failed to disburse the $500,000.00 plus interest to Oaklawn.

52. Contrary to the limited authority granted Stewart Title under the Escrow Agreement, Stewart Title refused to disburse the $500,000.00 until it had contacted Exxon to determine whether Exxon approved of the Disbursement Request. Under the Escrow Agreement, Stewart Title was protected from liability if it relied upon any written notice or demand, and was not authorized to otherwise communicate with either Oaklawn or Exxon except as permitted by the terms of the Escrow Agreement. The Escrow Agreement did not authorize or permit Stewart Title to delay in complying with the Disbursement Request beyond the five day period so as to enable it to communicate with Exxon for purposes of determining whether Exxon wanted to object to the release the $500,000.00.

53. Rather, upon the expiration of the 5 day period, Stewart Title was "irrevocably directed" to disburse the $500,000.00 to Oaklawn and was not authorized to communicate with Exxon for purposes of soliciting or encouraging Exxon to object to the disbursement of $500,000.00.

54. By letter dated February 11, 2010, sent electronically to Stewart Title, counsel for Oaklawn demanded that Stewart Title immediately disburse the $500,000.00 stating that under the Escrow Agreement, Stewart Title "was given no discretionary latitude on [its} obligations to perform and the manner of performing them, as a result of a failure to honor the Disbursement

Request as it has been irrevocably directed to do, is in breach of these obligations." Stewart Title ignored this letter and its obligation to immediately disburse the $500,000.00.

55. Later that day, on February 11, 2010, Exxon, only as a result of the unauthorized intervention of Stewart Title, issued a belated and untimely written notice objecting to the disbursement of the $500,000.00.

56. Despite the fact that this notice from Exxon was a legal nullity and of no effect, since the time period had elapsed already thereby triggering Stewart Title' irrevocable obligation to disburse the $500,000.00, Stewart Title in willful and blatant disregard of its obligation refused, and continues to refuse, to disburse the $500,000.00 to Oaklawn.

### H. Oaklawn's Interest in the Exxon Lot

57. As set forth in Exxon's letter dated February 11, 2010, Exxon's alleges that Oaklawn has not completed the "Seller's Work" as defined in the Contract and therefore, allegedly Oaklawn is not entitled to the release of the Escrow Deposit.

58. However, Oaklawn can not complete the Seller's Work as specifically defined in the Contract due to Exxon's breach of its Development Obligations, and the alternative redesign developed by Oaklawn at significant cost to Oaklawn eliminated the need to perform all of the Seller's Work as specifically set forth in the Contract.

59. In order to satisfy Exxon's demands and position as set forth in its February 11, 210 letter, Exxon must complete its Development Obligations, which includes the granting of the specified easements by Exxon and installation of the BaySaver.

60. Assuming (without conceding) the correctness of Exxon's position, then Oaklawn has a vested interest in having Exxon complete its Development Obligations in order for

13

Oaklawn to complete the Seller's Work specifically defined in the Contract in order to secure release of the $500,000.00 escrow deposit.

61.  Oaklawn has an interest under the Contract in the Exxon Lot to require Exxon to complete the Development Obligations in order to moot Exxon's objections to the release of the $500,000.00.

62.  Under the Escrow Agreement and Contract, the prevailing party is entitled to recover its attorney fees and costs.

## COUNT I
### (Breach of Escrow Agreement)

63.  The allegations contained in paragraphs 1 through 62 of the Complaint are incorporated and adopted by reference herein.

64.  Stewart Title has willfully breach its obligations under the Escrow Agreement to disburse the $500,000.00 plus interest to Oaklawn

65.  Exxon has breached its obligations under the Escrow Agreement by issuing an untimely dispute notice and thereby preventing Stewart Title from disbursing the $500,000.00 plus interest to Oaklawn.

66.  Oaklawn has been damaged as a result of this breach by Stewart Title and Exxon.

**WHEREFORE**, Plaintiff Oaklawn Development Partners, LLC, requests entry of a judgment against Defendant Stewart Title Guaranty Company and ExxonMobil Oil Corporation, jointly and severally, in the amount of Five Hundred Thousand Dollars ($500,000.00) plus interest that has accrued on the escrow deposit, plus entry of an order directing Defendant Title Guaranty Company to immediately disburse and deliver to Plaintiff the monies in escrow, plus pre and post judgment interests, reasonable attorney fees and costs, and such other damages that may accrue, and such other relief that the Court deems just and appropriate.

## COUNT II
### (Business Conspiracy – Va. Code §18-2-500)

67. The allegations contained in paragraphs 1 through 62 of the Complaint are incorporated and adopted by reference herein.

68. Stewart Title has conspired with Exxon to injure Oaklawn in its business by depriving it of the $500,000.00 that it is lawfully entitled to and should have received from Stewart Title.

69. Stewart Title, in violation of its limited authority under the Escrow Agreement, refused to disburse the $500,000.00 upon the expiration of the 5 day period and instead, unlawfully exceeded its authority by unilaterally and independently contacting Exxon to secure and obtain Exxon's written objection to the disbursement of the $500,000.00.

70. Stewart Title, in consideration of its business relationship with Exxon and in order to promote and advance its own financial interests in derogation of its fiduciary and contractual obligations under the Escrow Agreement to Oaklawn, has willfully breached its obligations by unlawfully conspiring with Exxon to deprive Oaklawn of the money it is entitled to under the Escrow Agreement.

71. Stewart Title and Exxon acted intentionally, purposely, and without lawful justification in conspiring to together to generate a notice of dispute after the expiration of the 5 day period to serve as pretext for Stewart Title not to release the $500,000.00 to Oaklawn.

72. Stewart Title's active participation in this course of conduct was designed to assist and support Exxon in its efforts to defend its breach of the Contract and failure to perform its Development Obligations by depriving Oaklawn of the funds it was entitled to, with the objective of pressuring and/or coercing Oaklawn to acquiesce and/or accept Exxon's actions in refusing to perform under the Contract.

73. This conspiracy and the intended goal of denying Oaklawn the financial resources has damaged Oaklawn in its business.

**WHEREFORE**, Plaintiff Oaklawn Development Partners, LLC, requests entry of a judgment against Defendant Stewart Title Guaranty Company and ExxonMobil Oil Corporation, jointly and severally, in the amount of Five Hundred Thousand Dollars plus treble damages in the amount of $1.5 million dollars ($1,500,000.00) as authorized by Va. Code §18-2-500, plus pre and post judgment interests, reasonable attorney fees and costs, and such other damages that may accrue, and such other relief that the Court deems just and appropriate.

### Count III
### (Breach of Contract - Exxon)

74. The allegations contained in paragraphs 1 through 62 of the Complaint are incorporated and adopted by reference herein.

75. Exxon breached its Development Obligations under the Contract.

76. Oaklawn has been damaged as a result of this breach, in that Oaklawn has incurred out-of-pocket expenses in developing and redesigning alternative means to complete the Development Plans which work and expenses would not have been required but for Exxon's breach.

77. Exxon's breach caused an ordinate delay in establishing the easements on the Exxon Lot and prevented Oaklawn from timely completing its Seller Work, all of which needed to be accomplished before Davco was obligated to close on the Wendy's Contract. As a result of this delay, Davco was able to terminate the Wendy's Contract when economic conditions had deteriorated in the marketplace, which would not have occurred but for the delay caused by Exxon's breach..

78. Had Exxon timely performed its Development Obligations, the time period for Davco to terminate the Wendy's Contract would have expired before Davco made the decision to terminate the Wendy's Contract based upon the drastic change in the economic conditions of the marketplace.

**WHEREFORE**, Plaintiff Oaklawn Development Partners, LLC, requests entry of a judgment against Defendant ExxonMobil Oil Corporation, jointly and severally, in the amount of One Million Three Hundred and Fifty Thousand Dollars and 00/100 ($1,350,000.00) plus pre and post judgment interest, reasonable attorney fees and costs, and such other damages that may accrue, and such other relief that the Court deems just and appropriate.

### Count IV
### (Specific Performance and *Lis Pendens* - Exxon)

79. The allegations contained in paragraphs 1 through 62 of the Complaint are incorporated and adopted by reference herein.

80. Exxon asserts that Oaklawn is not entitled to the release of the $500,000.00 in escrow because the Seller's Work has not been completed in accordance with the specific terms set forth in the Contract.

81. The completion of the Seller's Work as alleged by Exxon is dependant upon the performance of Exxon's Development Obligations under the Contract, including the grant of certain easements and construction of the BaySaver.

82. Oaklawn has an interest in the Exxon Lot by virtue of its right to have Exxon complete the Development Obligations on the Exxon Lot under the Contract in order to secure the release of the $500,000.00 from escrow.

**WHEREFORE**, Plaintiff Oaklawn Development Partners, LLC, requests entry of a order of specific performance compelling Defendant ExxonMobil Oil Corporation to complete

performance of its Development Obligations on the Exxon Lot as required by the Court, plus reasonable attorney fees and costs, and such other relief that the Court deems just and appropriate.

**OAKLAWN DEVELOPMENT PARTNERS, LLC**

**BY COUNSEL**

_____
Bradshaw Rost, Esq., Bar No. 27134
TENENBAUM & SAAS, P.C.
4504 Walsh Street, Suite 200
Chevy Chase, Maryland 20815
(301) 961-5300
Counsel for Plaintiff Oaklawn Development Partners, LLC

**JURY DEMAND**

Plaintiff demands a jury trial on the claims set forth above.

_____
Bradshaw Rost